**FILED**

**April 26, 2022**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**

**Antero Resources Corporation,**
**Petitioner,**

**vs.) No. 20-0964** (Harrison County 13-C-528-2)

**L&D Investments, Inc.;**
**Richard Snowden Andrews, Jr.;**
**Marion A. Young Trust;**
**Charles A. Young, David L. Young,**
**and Lavinia Young Davis,**
**successors of Marion A. Young;**
**Charles Lee Andrews, IV;**
**Elisa S. Andrews;**
**Frances L. Andrews; and**
**Mike Ross, Inc.,**
**Respondents.**

AND

**Mike Ross, Inc.,**
**Petitioner,**

**vs.) No. 20-0967** (Harrison County 13-C-528-2)

**Antero Resources Corporation,**
**Respondent.**

**MEMORANDUM DECISION**

Antero Resources Corporation ("Antero") appeals the November 2, 2020, order of the Circuit Court of Harrison County, which granted, in part, and denied, in part, its motion for summary judgment on its cross claim for indemnity against Mike Ross, Inc., ("MRI") pertaining to gas royalties paid to MRI pursuant to a 2014 written agreement during the pendency of this case, which originated in 2013 when the plaintiffs, L&D Investments,

1

Inc., and others[1] (hereinafter collectively "plaintiffs"), sought to quiet title to a 1,041-acre mineral parcel located in Harrison County.[2] Antero contends that the circuit court erred by giving MRI a four-million-dollar offset from the amount due under the 2014 agreement and by not awarding interest on its $2,914,943.75 judgment against MRI. Alternatively, Antero argues that if MRI receives the offset from the amount due under the 2014 agreement, then Antero should be refunded the four million dollars currently being held in escrow in accordance with its separate settlement agreement with the plaintiffs.

MRI appeals the same order[3] contending that the circuit court erred by not entering summary judgment in its favor. MRI asserts that the 2014 agreement is unenforceable and, furthermore, Antero's indemnity claim was extinguished as a result of MRI's four-million-dollar offer of judgment, which was accepted by the plaintiffs.[4]

Having carefully considered the parties' briefs and arguments, the submitted record, and the applicable authorities, we find no error in the circuit court's rulings with one exception. For the reasons set forth below, we find that Antero is entitled to recover interest on its $2,914,943.75 judgment against MRI pursuant to the parties' 2014 agreement. Because this case presents no substantial question of law or fact, a memorandum decision is appropriate under Rule 21 of the West Virginia Rules of Appellate Procedure.

As previously noted, this case began in 2013 as an action by the plaintiffs to quiet title to an approximately 1,041-acre mineral parcel. At that time, Antero and other gas developers were extracting oil and gas from the subject property pursuant to a lease agreement[5] and were making royalty payments to MRI, who claimed to be the owner of

---

[1] The individual plaintiffs are Richard Snowden Andrews, Jr., Charles A. Young, David L. Young, Lavine Young Davis, Charles Lee Andrews, IV, Elisa S. Andrews, and Frances L. Andrews. The Marion A. Young Trust is also a plaintiff in this case.

[2] Antero's appeal was docketed as Case No. 20-0964.

[3] MRI's appeal was docketed as Case No. 20-0967. It was consolidated with Antero's appeal for argument and decision by this Court by order entered on September 30, 2021.

[4] Antero is represented in this matter by Ancil G. Ramey, Esq., W. Henry Lawrence, Esq., and Justin A. Rubenstein Esq. David J. Romano, Esq., is counsel for the plaintiffs. Benjamin L. Bailey, Esq., Rebecca D. Pomeroy, Esq., and Christopher D. Smith, Esq., are the attorneys for MRI.

[5] The property was initially leased in 1902 and has remained in production since that time.

eighty percent of the mineral interests[6] pursuant to a 2003 tax deed that it received after purchasing the subject property at a delinquent tax sale. In their complaint, the plaintiffs alleged that they collectively owned a 36.44% undivided interest in the property; that they had continuously paid their real property taxes on their oil and gas interests before and after the delinquent tax sale; and that their payment of the taxes rendered the tax deed issued to MRI void. In addition to seeking a declaration that they had an ownership interest in the mineral estate, the plaintiffs also named Antero and the other gas developers as defendants[7] and asserted a multitude of claims against them and MRI including claims for misappropriation, trespass, fraud, deceit, conversion, slander of title, unauthorized pooling of mineral interests, and punitive damages, as well as the unpaid gas royalties.

The case was litigated for the next four years with the parties engaging in extensive discovery and filing multiple motions for summary judgment. Then, by order entered February 21, 2017, the circuit court entered summary judgment in favor of MRI, finding that the plaintiffs had failed to do what was necessary to have their mineral interests properly assessed; that plaintiffs' mineral interests were properly sold because of their delinquent taxes; and, furthermore, the plaintiffs' claims were barred by the three-year statute of limitations on challenges to tax deeds. Accordingly, the circuit court declared MRI to be the owner of eighty percent of the mineral interests pursuant to its tax deed.

Thereafter, the plaintiffs appealed to this Court, and the circuit court's decision was reversed in *L&D Investments, Inc. v. Mike Ross, Inc.*, 241 W. Va. 46, 818 S.E.2d 872 (2018) (hereinafter *L&D Investments I*). In that decision, this Court found that the Harrison County Assessor had issued double tax assessments on the subject property, that the tax tickets paid by the plaintiffs were the real property tax assessments, and therefore, the taxes on their mineral interests were never delinquent. *Id.* at 55, 818 S.E.2d at 881. This Court further found that because MRI's tax deed was void, the plaintiffs' claims were not barred by the applicable statute of limitations. *Id.* Accordingly, the case was remanded to the circuit court for further proceedings.

When the case was returned to the circuit court, a trial date was set for November 18, 2019, on the plaintiffs' various tort and contract claims against MRI, Antero, and the other gas developers. A few weeks prior to the scheduled trial, the circuit court ordered Antero to comply with the plaintiffs' discovery request for copies of any title examinations with respect to the 1902 mineral lease. Antero produced records of two title exams conducted in February 2007 and September 2013. The plaintiffs maintain that these two

---

[6] The mineral interests at issue were only oil and gas; the coal interests are separately owned and not relevant to this case.

[7] The plaintiffs settled their claims with the other gas developers, and they are not parties in these appeals.

3

title exams showed that MRI's 2003 tax deed was void and, therefore, Antero knew that it should have been making royalty payments to the plaintiffs. Yet, Antero had continued to make royalty payments to MRI after the plaintiffs filed their complaint. In that regard, the record shows that when the plaintiffs filed their complaint in 2013, Antero temporarily suspended its royalty payments to MRI. However, in 2014, Antero and MRI entered into an agreement, unbeknownst to the plaintiffs or the circuit court, whereby Antero agreed to resume making royalty payments to MRI and MRI agreed that it would reimburse Antero for the royalty payments with interest, to the extent it was determined that MRI did not own the mineral rights.

The written agreement executed by Antero and MRI on July 14, 2014, provided, in relevant part, as follows:

> WHEREAS, Antero will resume making royalty payments to Mike Ross, Inc. with the understanding that Mike Ross, Inc. will indemnify Antero for any overpayment and any interest due or accrued on the overpayment as a result of the competing claim of L&D Investments, Inc.

> NOW, THEREFORE, in consideration of the mutual promises and covenants of the parties contained herein, Antero and Mike Ross, Inc., agree as follows:

> 1. Antero agrees to resume payments to Mike Ross, Inc. pending resolution of the ownership dispute that is the subject of the Civil Action. In consideration of Antero's promise to resume payments to Mike Ross, Inc., Mike Ross, Inc. agrees to reimburse Antero in full for any amount of royalties in excess of what Mike Ross, Inc. may actually own along with the full amount of interest due or accrued on the overpayments in the event that L&D Investments, Inc., or any other party, is deemed to own an interest in the subject minerals for which Mike Ross, Inc. now claims.

Although the agreement provided for the payment of interest on any overpayment, no interest rate was specified therein. Pursuant to the agreement, Antero paid royalties to MRI

4

from 2014 until 2018, when this Court issued its decision in *L&D Investments I.* The total amount of royalties Antero paid to MRI was \$6,914,943.75.[8]

After the case was remanded to the circuit court, MRI argued that this Court's decision only applied to the plaintiffs' 36.44% ownership interest in the oil and gas and that it owned the remaining portion of the 80% interest set forth in the tax deed. Accordingly, MRI moved for summary judgment, asking the circuit court to declare that it owned the remaining interest in the oil and gas as set forth in the 2003 tax deed. By order entered October 29, 2019, the circuit court denied MRI's motion and ruled that the entirety of the 2003 tax sale was void pursuant to this Court's decision; that MRI had no ownership interest in the mineral rights; and that MRI was not entitled to any of the royalty payments.

Two days after the circuit court ruled that MRI had no ownership interest in the mineral rights, MRI made an offer of judgment[9] to the plaintiffs in the amount of four million dollars in exchange for "a full release of all claims asserted by Plaintiffs against MRI and, similarly, an agreement by MRI to forego any further claims in this case." The plaintiffs accepted the offer.

On November 12, 2019, Antero filed an amended cross claim against MRI seeking indemnification pursuant to their 2014 agreement plus interest. Antero then reached a

---

[8] As discussed further herein, MRI contends that this figure is in dispute because Antero's 30(b)(7) representative, Alvyn Schopp, testified at a deposition that the amount of royalties paid were \$6,506,754.11, but in a subsequent affidavit, he indicated that the royalties paid were \$6,914,943.75.

[9] Rule 68(a) of the West Virginia Rules of Civil Procedure provides:

> At any time more than 10 days before the trial begins, a party defending against a claim may serve upon the adverse party an offer to allow judgment to be taken against the defending party for the money or property or to the effect specified in the defending party's offer, with costs then accrued. If within 10 days after the service of the offer the adverse party serves written notice that the offer is accepted, either party may then file the offer and notice of acceptance together with proof of service thereof and thereupon the court shall direct entry of the judgment by the clerk.

Subsection (c) of Rule 68 states that if the offer is rejected and the offeree later obtains a judgment less favorable than the offer, then "the offeree must pay the costs incurred after the making of the offer."

settlement with the plaintiffs just three days later, on the eve of trial. The settlement between Antero and the plaintiffs was memorialized in a written agreement executed on December 9, 2019. The agreement provided that the Plaintiffs and Antero agreed:

> 1. Antero will pay Plaintiffs the sum of $7,000,000.00, as per counsel's emails attached hereto as "Exhibit No. 1."

The referenced emails included an email sent at 11:16 a.m. on November 15, 2019, by Antero's counsel to the plaintiffs' counsel stating: "Yes, Antero agrees to the $7M (Antero calculates as royalties of $5,621,285.25; interest of $1,378,714.75). The other details I will send by letter today." The plaintiffs' counsel then responded by email at 11:27 a.m., that same day, as follows:

> My clients confirm Antero's agreement to the $7,000,000.00 payment from Antero to resolve all claims Plaintiffs asserted against Antero including unpaid royalties current through July 2019 (May 2019 production), loss of value/interest, tort claims, contract claims or any other known or unknown claims except for the separate settlement regarding the pooling issues; while I understand Antero desires a formula for its internal documentation Plaintiffs arrived at the final settlement figure of $7,000,000.00, to compensate for all claims and all expected damages that could have been returned by the jury and did not itemize each such damage item as some were intangible dependent only on the jury's determination after hearing all the evidence; I await your details as we discussed earlier this morning; thank you and I'm glad our clients could reach an amicable resolution.

The written settlement agreement also included the following provision in paragraph two:

> Any claims by Antero or MRI to offset or reduce the amounts in Section 1, above, by Plaintiffs' acceptance of Mike Ross, Inc.'s $4,000,000.00 Offer of Judgment will be preserved by all Parties, as will Plaintiffs' right to contest such offset or reduction. If the issues need to be resolved among Antero, MRI and/or Plaintiffs, then Antero and Plaintiffs agree to submit such issues to Judge Bedell for resolution of both legal and factual issues, if any, and reserve the rights of any party to appeal Judge Bedell's rulings on those issues. Antero agrees to deposit $4,000,000.00 of the $7,000,000.00 settlement payment in Paragraph 1, above, in an interest bearing account at an agreed FDIC insured institution, in West

6

Virginia, with Counsel for Antero and Plaintiffs being Joint Escrow Agents, with such fund representing the amount of MRI's Offer of Judgement accepted by Plaintiffs which upon resolution of the offset or reduction issues whether by agreement of Antero and Plaintiffs or by final order of the court of last resort, Antero and Plaintiffs will agree to pay or refund all or any part of such deposited funds and accrued interest as agreed or as ordered in a final decision by such court of last resort. Finally, $3,000,000.00 of the $7,000,000.00 settlement payment in Section 1, above, shall be paid to Plaintiffs' counsel as Trustee on December 9, 2019.

Thus, Antero maintained that it did not have to pay the plaintiffs the four million dollars placed in escrow, asserting that it was entitled to a refund of that amount because of the offer of judgment made by MRI. In other words, Antero contended that it was not required to pay the four million dollars because MRI agreed to indemnify and reimburse Antero for any overpayment of royalties through the 2014 agreement.

Subsequently, Antero and MRI filed cross-motions for summary judgment with respect to Antero's amended cross claim for indemnity from MRI pursuant to their 2014 agreement. Antero argued that MRI's offer of judgment did not extinguish its claim for express indemnity under their agreement. Antero asserted that MRI should pay the plaintiffs the four million dollars it had offered and should reimburse Antero the three million dollars it paid plaintiffs pursuant to its separate settlement agreement with the plaintiffs. Antero further asserted that it was entitled to the four million dollars being held in escrow and that MRI should further pay Antero $2,630,025.50 as the interest that accrued on the royalties that Antero paid MRI between 2014 and 2018 while the case was pending.

Conversely, MRI argued that the July 2014 agreement with Antero was an illusory contract, unsupported by consideration, and violative of public policy. MRI further asserted that Antero breached the 2014 agreement when it stopped paying MRI the royalties in 2018 after this Court issued its decision in *L&D Investments I*. In addition, MRI asserted that it satisfied the damages claimed by the plaintiffs through the offer of judgment thereby extinguishing any claim Antero had for indemnity and, furthermore, Antero waived its right to indemnity by failing to allocate damages in its settlement with the plaintiffs. Finally, MRI argued that the indemnity agreement did not apply because Antero's settlement with plaintiffs resolved all of plaintiffs' claims in addition to the royalties.

The plaintiffs also filed a motion for summary judgment against Antero concerning offset and contribution. Plaintiffs argued that Antero was not entitled to the four million dollars in escrow even though plaintiffs received four million dollars from MRI through its

offer of judgment. Plaintiffs maintained that their settlement with Antero resolved all of their claims, not just the claim for the unpaid royalties, and that any set off claim between Antero and MRI should not operate to the plaintiffs' detriment.

The circuit court ruled on the summary judgment motions in its November 2, 2020, order. The circuit court granted, in part, and denied, in part, Antero's motion for summary judgment on its amended cross claim and denied MRI's motion for summary judgment. The court noted that Antero and MRI had voluntarily settled with the plaintiffs separately and without any discussion regarding the impact those settlements would have upon their 2014 agreement. The circuit court determined that MRI had received $6,914,943.75 in royalty payments from Antero while the case was being litigated. Finding the 2014 agreement to be valid and binding, the circuit court ruled that Antero was entitled to reimbursement for the entire amount of royalty payments made under the agreement, but MRI would receive an offset of four million dollars based on its offer of judgment, which the plaintiffs accepted. Thus, the circuit court ordered MRI to pay Antero $2,914,943.75 as reimbursement for the royalty payments. With regard to the payment of interest as set forth in the agreement, the circuit court found that the provision only applied in the event of a jury verdict and therefore, Antero could not collect any interest. As to the four million dollars being held in escrow, the circuit court ordered Antero to release the money to the plaintiffs, finding that Antero had agreed to a settlement of seven million dollars to resolve all of the plaintiffs' claims against it and had not apportioned the settlement among the plaintiffs' various claims. Upon entry of the circuit court's order, these appeals followed.

Antero and MRI appeal the circuit court's summary judgment rulings. It is well-established that a "[a] circuit court's entry of summary judgment is reviewed *de novo*." Syl. Pt. 1, *Painter v. Peavy*, 192 W. Va. 189, 451 S.E.2d 755 (1994). Accordingly, with this standard in mind, we consider the parties' arguments.

At the heart of Antero and MRI's appeals is the circuit court's finding that their 2014 agreement is a valid enforceable contract. Antero takes issue with the manner in which the circuit court applied the agreement while MRI contends that the agreement is not enforceable at all. Accordingly, we first consider MRI's contention that the circuit court erred in finding that the parties' agreement was a valid enforceable contract. MRI argues that the agreement was not enforceable for two reasons: lack of consideration and breach of the contract by Antero.

MRI first contends that Antero offered no consideration in return for its promise to provide reimbursement for any overpayment of royalties because Antero had a preexisting duty to make royalty payments to the owner(s) of the mineral rights. MRI argues that at that time the agreement was made, it was the owner pursuant to its tax deed and, therefore, Antero was already obligated to make the royalty payments to MRI. In support of its argument, MRI points to syllabus point one of *Cole v. George*, 86 W. Va. 346, 103 S.E.

201 (1920), which holds that "[a]n agreement by one to do what he is already legally bound to do is not a good consideration for a promise made to him."

Indisputably, "[n]o promise is good in law unless there is a legal consideration in return for it." Syl. Pt. 1, *Thomas v. Mott*, 74 W. Va. 493, 82 S.E. 325 (1914). Indeed, "consideration is an essential element of, and is necessary to the enforceability or validity of a contract[.]" *First Nat'l Bank of Gallipolis v. Marietta Mfg. Co.*, 151 W. Va. 636, 642, 153 S.E.2d 172, 177 (1967). Consequently, "'[a] promise or contract where there is no valuable consideration, and where there is no benefit moving to the promisor or damage or injury to the promisee, is void.' Syl. Pt. 2, *Sturm v. Parish*, 1 W.Va. 125 (1865)." Syl. Pt. 4, *Dan Ryan Builders, Inc. v. Nelson*, 230 W. Va. 281, 737 S.E.2d 550 (2012). Regarding what is valuable consideration, this Court has long held that "[a] valuable consideration may consist either in some right, interest, profit or benefit accruing to the one party or some forbearance, detriment, loss or responsibility given, suffered, or undertaken by the other." Syl. Pt. 2, *Tabler v. Hoult*, 110 W. Va. 542, 158 S.E. 782 (1931).

Upon review, we agree with the circuit court's ruling that MRI received valuable consideration under the 2014 agreement. As the circuit court found, "MRI was provided a distinct and highly lucrative financial benefit; that being a very significant cash flow during an extended period of time for pursuing and financing other mineral rights and income producing investments[.]" While MRI is correct that gas developers have a contractual obligation to pay royalties to mineral owners, at the time the agreement between MRI and Antero was executed, MRI's ownership interest was in dispute. As the circuit court noted in its order, the proper course of action would have been to pay the royalties into the trial court pending resolution of the ownership dispute. But that did not happen. Instead, MRI sought out Antero and requested that Antero continue to pay the royalties to MRI which resulted in the parties executing the 2014 agreement. Having received such a significant benefit from the agreement in the form of a steady stream of cash for four years, there is no merit to MRI's claim that the 2014 agreement lacked consideration.

Likewise, there is no merit to MRI's claim that Antero breached the contract thereby rendering it unenforceable. "As a rule . . . a party is barred from enforcing a contract that it has materially breached." *Triple 7 Commodities, Inc. v. High Country Mining, Inc.*, 245 W.Va. 63, 73, 857 S.E.2d 403, 413 (2021), quoting 17A Am. Jur. 2d *Contracts* § 589. Here, MRI asserts that Antero breached the contract when it halted the royalty payments in May 2018 after this Court issued its decision in *L&D Investments I*. MRI contends that at that juncture, ownership of the portion of the mineral interests not claimed by the plaintiffs remained in dispute. Therefore, MRI reasons that Antero should have continued making the royalty payments to MRI under the agreement until the circuit court conclusively ruled in its October 29, 2019, order that MRI has no ownership interest in any of the mineral rights.

In *L&D Investments I*, this Court found that the plaintiffs' mineral interests were never delinquent "[b]ecause of the double assessments and the payment of the taxes by the [plaintiffs]" and "[t]herefore, the sale of the subject mineral interests for delinquent taxes was void as a matter of law." *Id.* at 55, 818 S.E.2d at 881. Having so found, this Court "remanded this case for entry of an order declaring the tax deed issued to MRI void as a matter of law." *Id.* at 56, 818 S.E.2d at 882. Given this Court's clear pronouncement that MRI's tax deed was void, Antero's decision to suspend the royalty payments to MRI upon the release of that opinion cannot be deemed a breach of the 2014 agreement.

Having found no merit to MRI's argument that the 2014 agreement is unenforceable, we now consider Antero's assertion that the circuit court misapplied the agreement by only awarding it a judgment against MRI for $2,914,943.75 without interest. Antero argues that pursuant to the plain language of the parties' agreement, MRI was contractually obligated to reimburse it for the entire amount of royalties MRI received during the pendency of the litigation, which was $6,914,943.75 plus interest.

MRI maintains, however, that the agreement did not provide for a "blanket return of royalties," but rather, the agreement was premised upon Antero's actual liability for royalty payments made to MRI instead of the appropriately entitled royalty interest owners. MRI further contends that it resolved the issue of the misdirected royalty payments through its offer of judgment, which the plaintiffs accepted. In other words, MRI reasons that the plaintiffs' acceptance of its $4,000,000 offer of judgment resolved the plaintiffs' claim for the misdirected royalties, and, therefore, Antero's indemnification claim was extinguished. In support of its argument that Antero was required to show actual liability to recover the royalty payments, MRI relies upon *Valloric v. Dravo Corp.,* 178 W. Va. 14, 357 S.E.2d 207 (1987). In that case, this Court held that "[w]here an indemnitor has not been notified of the underlying litigation and given an opportunity to participate in the settlement negotiations, then an indemnitee must prove that he was actually liable to the plaintiff." *Id.* at 15, 357 S.E.2d at 208, syl. pt. 3.

After review, we find MRI's reliance upon *Valloric* is misplaced. While an express indemnity agreement was also at issue in *Valloric*, the terms of that agreement differ vastly from the agreement at issue in this case. Specifically, *Valloric* involved an agreement between a contractor and the owner of a construction site and the general contractor. The contractual provision at issue in that case provided as follows:

> The Contractor agrees to indemnify and hold harmless the Owner, Engineer and General Contractor against any and all claims for loss, liability, or damage, on account of property damage or personal injury (including death), arising out of or in connection with the work done or to be performed and in connection with or arising out of the acts or omissions of Contractor's employees, however caused, while said

10

employees are upon, entering or leaving the premises upon which this Agreement is being or is to be performed, provided that Contractor does not hereby assume responsibility for the sole negligence of General Contractor, Engineer or Owner.

*Id.* at 16, 357 S.E.2d at 209.  By its plain language, the indemnity provision in *Valloric* was "for claims for loss, liability and damage."  *Id.*  No such language was included in the agreement at issue in the case at bar.  Instead, the agreement provides that MRI will

reimburse Antero in full for any amount of royalties in excess of what Mike Ross, Inc. may actually own along with the full amount of interest due or accrued on the overpayments in the event that L&D Investments, Inc., or any other party, is deemed to own an interest in the subject minerals for which Mike Ross, Inc. now claims.

This Court has held that "[i]n construing the language of an express indemnity contract, the ordinary rules of contract construction apply."  Syl. Pt. 4, *VanKirk v. Green Construction Co.*, 195 W. Va. 714, 466 S.E.2d 782 (1995).  One of those rules is that "[a] valid written instrument which expresses the intent of the parties in plain and unambiguous language is not subject to judicial construction or interpretation but will be applied and enforced according to such intent." Syl. Pt. 1, *Cotiga Development Co. v. United Fuel Gas Co.*, 147 W. Va. 484, 128 S.E.2d 626 (1962). To that end, "[i]t is not the right or province of a court to alter, pervert or destroy the clear meaning and intent of the parties as expressed in unambiguous language in their written contract or to make a new or different contract for them."  *Id.* at 484, 128 S.E.2d at 628, syl. pt. 3.

The 2014 agreement between Antero and MRI plainly and unambiguously provides that MRI will reimburse Antero for the royalty payments it received "in the event that L&D Investments, Inc. or any other party, is deemed to own an interest in the subject minerals for which [MRI] now claims."  By this Court's decision issued on May 22, 2018, in *L&D Investments I*, the plaintiffs were "deemed to own an interest in the subject minerals" thereby triggering MRI's contractual obligation under the 2014 agreement to reimburse Antero for the "amount of royalties in excess of what MRI . . . own[ed]."  Accordingly, the circuit court did not err in finding that under the express terms of the 2014 agreement, MRI was required to reimburse Antero "the entire amount of royalty payments received from Antero pertaining to the Subject Property and the 1902 Andrews Lease in the amount of $6,914,943.75."

While the circuit court found that MRI had a contractual obligation to reimburse Antero for the entire amount of royalty payments it received for the subject property, the circuit court further found that

11

[g]iven the timing, nature and totality of these parties' respective settlements with Plaintiffs, particularly with respect to such royalty payments, MRI shall be entitled to and receive an offset of Four Million Dollars ($4,000,000.00) to such reimbursement to Antero that reflects MRI's total settlement with Plaintiffs herein.

We find no error in this decision as "[i]t is generally recognized that there can be only one recovery of damages for one wrong or injury. Double recovery of damages is not permitted; the law does not permit a double satisfaction for a single injury." Syl. Pt. 7, in part, *Harless v. First Nat'l Bank in Fairmont*, 169 W. Va. 673, 289 S.E.2d 692 (1982). Through its offer of judgment of four million dollars, MRI partially satisfied the plaintiffs' claim for the misdirected royalty payments. Under these particular circumstances, allowing MRI an offset prevents any double recovery of damages by plaintiffs for the gas royalties as well as any double payment by MRI.

While we find that the circuit court did not err in granting Antero a judgment against MRI in the amount of $2,914,943.75,[10] the circuit court's decision to deny Antero interest on that judgment is contrary to the express terms of the 2014 agreement. The circuit court

---

[10] As noted earlier, MRI asserts that the amount of royalty payments it received from Antero is a contested fact because Antero's 30(b)(7) representative reported different amounts at his deposition and in his subsequent affidavit filed in support of Antero's motion for summary judgment. Antero contends that its witness updated his earlier testimony with his affidavit and there is no dispute. Upon review, we find that MRI did not satisfy its burden to produce evidence to show that the amount of royalties paid as reported by Antero was not accurate. As this Court has held:

> If the moving party makes a properly supported motion for summary judgment and can show by affirmative evidence that there is no genuine issue of a material fact, the burden of production shifts to the nonmoving party who must either (1) rehabilitate the evidence attacked by the moving party, (2) produce additional evidence showing the existence of a genuine issue for trial, or (3) submit an affidavit explaining why further discovery is necessary as provided in Rule 56(f) of the West Virginia Rules of Civil Procedure.

Syl. Pt. 3, *Williams v. Precision Coil, Inc.*, 194 W. Va. 52, 459 S.E.2d 329 (1995). Accordingly, we find no merit to this argument.

12

reasoned that absent "trial verdicts and pronounced judgments rendered thereon," Antero could not collect interest on the overpayment of royalties to MRI. However, the parties' agreement does not condition the payment of interest on a judgment resulting from a jury verdict nor can it be inferred that was the intent of the parties. Rather, as noted previously, the agreement plainly states that MRI "agrees to reimburse Antero in full for any amount of royalties paid in excess of what [MRI] may actually own along with *the full amount of interest due or accrued* on the overpayments." (Emphasis added).

Allowing Antero to collect interest on its judgment against MRI for the overpayment of the gas royalties is necessary to effectuate the parties' intent and give meaning to the entirety of their contract. In that regard, this Court has held that "[a] contract must be considered as a whole, effect being given, if possible, to all parts of the instrument." Syllabus, *Clayton v. Nicely*, 116 W. Va. 460, 182 S.E. 569 (1935). Furthermore,

> [t]he primary consideration in the construction of a contract is the intention of the parties. This intention must be gathered from an examination of the whole instrument, which should be so construed, if possible, as to give meaning to every word, phrase and clause and also render all its provisions consistent and harmonious.

Syl. Pt. 7, *Henderson Dev. Co. v. United Fuel Gas Co.*, 121 W. Va. 284, 3 S.E.2d 217 (1939). Accordingly, we reverse the circuit court decision to the extent that it denied Antero the interest due or accrued on the overpayment of the gas royalties. While the parties clearly provided in their agreement for the payment of interest, they did not specify the interest rate to be applied. Accordingly, we must remand this case to the circuit court for further proceedings to determine the amount of interest that Antero is entitled to collect on its judgment against MRI for the overpayment of the gas royalties.

Having now addressed the issues raised by Antero and MRI regarding the 2014 agreement, we turn our attention to the four million dollars currently being held in escrow as a result of the settlement between Antero and the plaintiffs. Antero argues that if MRI is allowed to offset its four-million-dollar offer of judgment from the amount it owes Antero under the 2014 agreement, then the circuit court's decision ordering the release of the settlement money being held in escrow to the plaintiffs must be reversed and Antero must be refunded the money. Antero says to hold otherwise results in a windfall for the plaintiffs because an eleven-million-dollar settlement was never contemplated. In other words, Antero contends that if MRI receives an offset on the reimbursement of royalties due under the parties' 2014 agreement, then Antero should receive the money being held in escrow so that plaintiffs do not receive a double recovery for the royalty payments.

13

Upon review of the settlement agreement, we find that Antero's argument lacks merit because there is no apportionment of the settlement proceeds among the plaintiffs' various claims or any agreement as to how the settlement would be applied. Simply put, Antero cannot show that its seven-million-dollar settlement with the plaintiffs only encompassed the plaintiffs' claim for the royalty payments wrongfully made to MRI. The settlement agreement itself provides in paragraph five that *"[t]his Agreement resolves all [of] Plaintiffs' claims in this civil action*, including claims for attorney fees and costs." (Emphasis added). Paragraph seven then states:

> Plaintiffs agree to and hereby release all remaining claims they now have or could have with respect to the Present Litigation and the Andrews Lease. Specifically, Plaintiffs do hereby fully release, acquit, and forever discharge Antero and its officers, directors . . . from any and all claims . . . including claims for payment of royalties, payment of interest, loss of value, waste, conversion, trespass, accounting, breach of contract, annoyance and inconvenience, attorney fees or other expenses, punitive damages, and interest, all other related costs and other direct or consequential losses of any nature whatsoever, that in any way arises out of or relates to the Present Litigation and the Andrews Lease.

In addition, the emails referenced in the settlement agreement and attached as an exhibit thereto make clear that the seven-million-dollar payment from Antero was "to resolve all claims Plaintiffs asserted against Antero including unpaid royalties current through July 2019 (May 2019 production), loss of value/interest, tort claims, contract claims or any other known or unknown claims except for the separate settlement regarding the pooling issues[.]" While Antero's responsive email attempted to breakdown the settlement amount as $5,621,285.25 for royalties and $1,378,714.75 for interest,[11] the plaintiffs flatly rejected that calculation, responding that "Plaintiffs arrived at the final settlement figure of $7,000,000.00 to compensate for all claims and all expected damages that could have been returned by the jury and did not itemize each such damage item as some were intangible dependent only on the jury's determination after hearing all the evidence." Clearly, there was never any agreement to apportion any particular amount of the settlement to any specific claim.

---

[11] Notably, the basis for Antero's breakdown of the settlement is not discernable from the record. Moreover, this calculation does not comport with Antero's claim that it paid MRI $6,914,943.75 in royalties under their 2014 agreement and that it is entitled to collect an additional sum as interest on that amount.

14

By entering into a general settlement with the plaintiffs, Antero chose to forego a trial and a jury determination as to its liability with respect to all the claims asserted by the plaintiffs. Antero also excluded MRI from the settlement negotiations. As the circuit court noted, "neither MRI nor Antero were given an opportunity by the other to mutually participate in settlement negotiations ultimately leading to their final settlements with Plaintiffs even though all such parties' [sic] litigant were fully aware of the existence of the July 14, 2014[,] Agreement." Consequently, there was no breakdown of the amount paid by Antero to resolve each of the plaintiffs' claims. We have recognized that "settlement agreements are to be construed 'as any other contract.'" *Burdette v. Burdette Realty Improvement, Inc.,* 214 W. Va. 448, 452, 590 S.E.2d 641, 656 (2003), quoting *Floyd v. Watson*, 163 W. Va. 65, 68, 254 S.E.2d 687, 690 (1979). Therefore, when a party seeks to attribute a certain settlement amount to a specific claim, the agreement must be drafted in plain and unambiguous language sufficient to make such intent clear. Courts have no authority to rewrite settlement agreements. *See Cotiga,* 147 W. Va. at 484, 128 S.E.2d at 628, syl. pt. 3. Here, the settlement agreement plainly provides that Antero will pay the plaintiffs seven million dollars to resolve all of the plaintiffs' claims. Critically, the settlement agreement lacks any apportionment of the settlement proceeds to the claim for the royalty payments. Accordingly, we find no error in the circuit court's decision ordering the release of the settlement money being held in escrow to the plaintiffs.

For the reasons set forth above, we affirm, in part, and reverse, in part, the circuit court's November 2, 2020, order, and remand this case to the circuit court for a determination of the amount of interest Antero is entitled to collect on its $2,914,943.75 judgment against MRI.

Affirmed, in part, Reversed, in part, and Remanded.

**Issued:** April 26, 2022

**Concurred in by:**

Chief Justice John A. Hutchison
Justice Alan D. Moats, sitting by temporary assignment.
Judge Gregory L. Howard, Jr., sitting by temporary assignment.

**Concurring, in part, and dissenting, in part:**

Justice Elizabeth D. Walker
Justice Tim Armstead

Justice William R. Wooton, deeming himself disqualified, did not participate in the decision in this case.

Walker, J., dissenting in part and concurring in part.

When a court abrogates unambiguous contractual provisions based on its own independent assessment of "reasonableness," the parties' freedom to contract is undermined. And rewriting a contract in the name of what a court perceives as the intended result contradicts the bedrock principle of American contract law that permits parties to contract as they see fit, and that calls on courts to enforce the agreement as written (absent some highly unusual circumstance such as a contract in violation of law or public policy). For these reasons, I respectfully dissent as to the majority's holding affirming the circuit court's decision that MRI was entitled to an offset of $4,000,000 toward its reimbursement of Antero pursuant to the indemnification agreement between MRI and Antero.

For years MRI purported to own the mineral rights at issue in this case, and Antero paid royalties to it. In 2013, L&D sued MRI and Antero claiming that it owned the mineral rights and sought to recover (1) royalties Antero had paid MRI, (2) damages for misappropriation, trespass, fraud, deceit, conversion, slander of title, unauthorized pooling of mineral interests, and (3) punitive damages. After the ownership dispute arose, Antero and MRI entered an indemnity agreement in which Antero agreed to continue royalty payments to MRI in exchange for MRI's promise to reimburse all post-agreement royalty payments and interest should a court find MRI's ownership void. After this Court deemed L&D the rightful owner of the mineral rights, MRI and L&D settled for $4,000,000. In exchange for the $4,000,000, L&D agreed to "a full release of all claims asserted by [L&D] against MRI . . . ." After Antero learned of MRI's independent settlement with L&D, it likewise settled "all . . . claims asserted by [L&D] against Antero . . . ." for $7,000,000.[1]

After settling with L&D, Antero demanded that MRI reimburse the $6,914,943.75 in royalties it paid MRI after entering the indemnity agreement, plus interest. But MRI attempted to invalidate the indemnity agreement arguing that no consideration supported it, among other things. Instead of invalidating it, the circuit court found that MRI's $4,000,000 settlement with L&D entitled it to a "setoff" of the amount it owed Antero under the independent indemnity agreement. The circuit court applied what it called the "fair meaning" of the indemnity agreement—rather than its plain meaning. For instance, the circuit court reasoned that

> [t]o . . . require MRI to return the entire amount of
> royalty payments made to it by Antero, with or without the
> identified setoff(s) would result in an impermissible double
> payment, in part or in whole, by MRI and allow Antero to

---

[1] Antero paid $3,000,000 of the settlement but escrowed $4,000,000 until the circuit court determined whether MRI's settlement entitled Antero to any credit toward its settlement.

16

improperly recover and be unjustly enriched the totality of their business transactions [sic] and the related claims of [L&D] against them respectively herein that spawn therefrom.

The circuit court also considered the "totality of mutually considered purposes for coming into existence and provisions therein made" to interpret the indemnity agreement. In fact, to reach its desired result, the circuit court rewrote the indemnity agreement in its order:

This [c]ourt gleans from the totality of considerations now upon the record herein that the overall intent and understanding of Antero and MRI at the time they entered into their [indemnity agreement] to be as such contractual language therein essentially reflects, to-wit: In the event any royalty payments made by Antero to MRI were ultimately found to be improper via judgment rendered in these proceedings, such payments would be relinquished by MRI so that they could then been [sic] properly accounted for and dispersed to accurately identified royalty owners according to legally determined royalty ownership proportions along with any interest that might otherwise actually be accruing thereon as a result of trial verdicts and related pronounced judgments rendered thereon and upon which interest would legally accrue in statutorily required fashion.

The circuit court's order contravenes our jurisprudence. First, this Court never recognized a "totality of . . . business transactions," "totality of mutually considered purposes," or "totality of considerations" approach to contract interpretation. Instead, we have consistently stated that "[i]t is not the right or province of a court to alter, pervert or destroy the clear meaning and intent of the parties as expressed in unambiguous language in their written contract or to make a new or different contract for them."[2] And despite what the circuit court believed the parties ought to have agreed to, the unambiguous agreement says

Antero agrees to resume payments to [MRI] pending resolution of the ownership dispute that is the subject of the Civil Action. In consideration of Antero's promise to resume payments to [MRI] [,] [MRI] agrees to reimburse Antero in full

---

[2] Syl. Pt. 3, *Cotiga Dev. Co. v. United Fuel Gas Co.*, 147 W. Va. 484, 128 S.E.2d 626 (1962).

for any amount of royalties paid in excess of what [MRI] may actually own along with the full amount of interest due or accrued on the overpayments in the event that [L&D], or any other party, is deemed to own an interest in the subject minerals for which [MRI] now claims.

Contrary to the circuit court's reformed agreement, the parties agreed that MRI would "reimburse Antero in full for any amount of royalties . . . [,]" not that "such payments would be relinquished by MRI so that they could then [be] properly accounted for and dispersed to accurately identified royalty owners according to legally determined royalty ownership proportions . . . ." The circuit court clearly erred when it ignored the indemnity agreement's plain language and provided no legal support for crediting MRI's settlement toward the amount it owed Antero under the indemnity agreement.

Second, MRI made an informed decision to settle with L&D for $4,000,000 knowing that it owed Antero $6,914,943.75, plus interest under the plain terms of the indemnity agreement. It made no "double payment"; it bargained for a settlement of many claims against it and provided no account of what portion of the settlement, if any, compensated L&D for misdirected royalties. Further, while concerning itself with possible double payment by MRI, the circuit court lacked the same concern for Antero which it required to pay the $4,000,000 that MRI bargained for. And requiring MRI to pay Antero the amount they agreed upon under the indemnity agreement would not unjustly enrich Antero as the circuit court insisted. We have held that a benefit unjustly enriches a party where it would be "inequitable and unconscionable" for them to retain it.[3] Allowing a party to receive the benefit it contracted for does not cause an inequitable or unconscionable result.

The majority affirms the circuit court's decision to credit MRI's settlement toward the amount it owed under the indemnity agreement reasoning that "allowing MRI an offset prevents any double recovery by [L&D] for the gas royalties as well as any double payment by MRI." But L&D received no "double recovery" when Antero and MRI independently settled the various tort and unpaid royalty claims against them; the settlements resolved the individual claims against Antero and MRI, not some unified claim for unpaid royalties as the majority suggests. We have recognized a right for defendants to set off the amount they owe plaintiffs whose damages arise from "a single, indivisible loss attributable to the

---

[3] *Realmark Dev. Inc. v. Ranson*, 208 W. Va. 717, 721-22, 542 S.E.2d 880, 884-85 (2000) (citing *Copley v. Mingo Cnty. Bd. of Educ.*, 195 W. Va. 480, 466 S.E.2d 139 (1995)).

18

combined actions of the multiple defendants . . . ."[4] But this is vastly different from allowing a defendant to set off a settlement amount against an amount they owe a co-defendant under an indemnity agreement, and the parties have cited no authority in which we have recognized such right. Indeed, the majority fails to explain how the circuit court's application of the indemnity agreement avoided double recovery by L&D when it would recover $11,000,000 regardless of how much MRI owed Antero under their indemnity agreement. And by suggesting that the circuit court avoided "double payment by MRI," the majority disregards the fact that MRI settled with L&D knowing that the plain terms of the indemnity agreement required it to reimburse Antero $6,914,943.75, plus interest. Under the pretext of preventing Antero from being unjustly enriched, the circuit court unjustly enriched MRI by allowing it to enter a nearly $7,000,000 indemnification agreement and a $4,000,000 settlement agreement but to pay only $6,914,943.75. And by affirming the circuit court's order, the majority tacitly approves a method of contract interpretation not recognized in this State.

This Court should have enforced MRI's settlement agreement, Antero's settlement agreement, and the indemnity agreement as the separate and distinct agreements that they are. MRI settled L&D's claims against it for $4,000,000 knowing that its owed Antero $6,914,943.75, plus interest under their indemnity agreement. And Antero likewise understanding that MRI owed it $6,914,943.75, plus interest under the indemnity agreement, settled with L&D for $7,000,000. But the circuit court rewrote the indemnity agreement and altered the parties' reasonable expectations despite our long-standing precedent that "[a] valid written instrument which expresses the intent of the parties in plain and unambiguous language is not subject to judicial construction or interpretation but will be applied and enforced according to such intent."[5]

Accordingly, I concur with the majority's decision that the plaintiffs below, and respondents in Case No. 20-0964, were entitled to the entire $4,000,000 offer of judgment from MRI and the entire $7,000,000 settlement they reached with Antero. I also concur with the majority's findings that MRI received valuable consideration for its indemnification agreement with Antero and that Antero did not breach the indemnification agreement. Finally, I also concur with the majority's reversal of the circuit court's determination that Antero was not entitled to interest on the amounts MRI owed Antero under the indemnification agreement. But, for the reasons set forth above, I dissent from the majority's holding affirming the circuit court's decision to award MRI an offset of $4,000,000 toward its reimbursement of Antero pursuant to the indemnification agreement.

---

[4] *Bd. of Educ. of McDowell Cnty. v. Zando, Martin, & Milstead, Inc.*, 182 W.Va. 597, 609, 390 S.E.2d 796, 808 (1990).

[5] Syl Pt. 5, *Lloyd's, London v. Pinnoak Res., LLC*, 223 W. Va. 336, 674 S.E.2d 197 (2008) (quoting Syl. Pt. 1, *Cotiga Dev. Co.*, 147 W. Va. at 484, 128 S.E.2d at 626).

I am authorized to state that Armstead, J., joins in this decision concurring in part and dissenting in part as to the majority's decision.